1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

NATIONAL WILDLIFE FEDERATION, et al.,

10                    Plaintiffs,                    No.  C04-2169Z

11    v.                                              ORDER

12    MIKE JOHANNS, SECRETARY OF
      AGRICULTURE, et al.,

13                    Defendants.

14

15    **<u>BACKGROUND</u>**

16    **I.      INTRODUCTION**

17          The Conservation Reserve Program ("CRP") is the nation's largest private lands

18    conservation program.  Complaint, docket no. 1, at ¶ 2.  Under the CRP, the U.S.

19    Department of Agriculture ("USDA") provides annual payments to farmers and other

20    participants who agree to establish and maintain vegetative cover on private agricultural

21    lands in furtherance of the CRP's stated purposes "to conserve and improve the soil, water,

22    and wildlife resources of such land."  Complaint, docket no. 1, at ¶ 2; 16 U.S.C. §§ 3831(a),

23    3832.  The CRP is administered by the Farm Service Agency ("FSA"), which offers private

24    landowners an annual per acre rental payment and up to half the cost of establishing a

25    permanent grassland cover in exchange for the landowner's contractual agreement to abide

26    by various terms governing the maintenance and use of the acreage for a period of 10 to 15

ORDER   -1-

1   years.  Complaint, docket no. 1, at ¶ 23; 16 U.S.C. §§ 3831(e); 3832(a).  This contractual

2   agreement includes (1) a conservation plan that the participant must agree to implement; (2)

3   a prohibition on the use of the land for agricultural purposes, except as permitted by the

4   Secretary; and (3) an agreement to establish approved vegetative cover on the land.  16

5   U.S.C. § 3832(a).  The legislation authorizing the CRP requires that the conservation plan be

6   designed and approved at the local level.  Id.  The plaintiffs admit that the CRP is

7   "successful and . . . popular with both farmers and conservationists" and has "dramatically

8   improved wildlife habitat on agricultural lands."  See Motion, docket no. 10, at 6.

9        Prior to the Farm Security and Rural Investment Act of 2002 ("Farm Bill"), the CRP's

10  authorizing legislation prohibited haying and grazing or other commercial use of CRP

11  acreage except under certain limited circumstances, such as in response to drought or similar

12  emergency.  Complaint, docket no. 1, at ¶ 26.  In 2002, the Farm Bill authorized the

13  Secretary of Agriculture to permit managed haying and grazing of lands enrolled in the CRP.

14  Id. at ¶ 27.  The relevant portion of the statute provides as follows:

15          [T]he Secretary may permit, consistent with the conservation of
            soil, water quality, and wildlife habitat (including habitat during
16          nesting seasons for birds in the area)--
              (A) managed harvesting and grazing (including the
17            managed harvesting of biomass), except that in permitting
              managed harvesting and grazing, the Secretary--
18            (i) shall, in coordination with the State technical
              committee--
19            (I) develop appropriate vegetation management
              requirements; and
20            (II) identify periods during which harvesting and grazing
              under this paragraph may be conducted.
21            . . .

22  16 U.S.C. § 3832(a)(7).  Landowners who obtain approval for managed haying and grazing

23  receive a reduced CRP rental payment for that acreage.  16 U.S.C. § 3832(a)(7)(A)(iii).

24       The FSA prepared a Final Programmatic Environmental Impact Statement ("PEIS") in

25  response to changes made to the CRP by the Farm Bill and the Notice of Availability was

26  published on January 17, 2003.  Complaint, docket no. 1, at ¶ 28; 68 Fed. Reg. 28,848.  The

1   FSA issued a Record of Decision ("ROD") adopting the Final PEIS on May 8, 2003.

2   Complaint, docket no. 1, at ¶ 32; 68 Fed. Reg. 28,848.  On that same date, the FSA adopted

3   an interim rule implementing the program (68 Fed. Reg. 24,830) and the rule was finalized

4   with minor changes on May 14, 2004.  Complaint, docket no. 1, at ¶ 32; 68 Fed. Reg.

5   24,830.  The ROD, the interim rule, and the final rule approved the FSA's Preferred

6   Alternative for implementing the managed haying and grazing program, as outlined in the

7   PEIS.  Complaint, docket no. 1, at ¶ 32; 68 Fed. Reg. 28,848.  In the summer of 2003, the

8   FSA issued two CRP Notices, allegedly without advance notice to the public.  Complaint,

9   docket no. 1, at ¶ 42.  The Notices were intended to provide policy "about adjusting the

10   primary nesting and broodrearing season" and "for determining the haying and grazing

11   period."  Id.; Notice CRP 439, Notice CRP 440, attached as Ex. B-C to Response, docket no.

12   18.

13   **II.   THE COMPLAINT**

14   Plaintiffs, all nonprofit environmental organizations, filed this lawsuit in October

15   2004 against defendants.  See Complaint, docket no. 1.  Plaintiffs allege harm under three

16   statutes in connection with the FSA's implementation of managed haying and grazing on

17   CRP lands: the National Environmental Policy Act ("NEPA"), the Farm Bill, and the

18   Administrative Procedure Act ("APA").  Id.  Because neither NEPA nor the Farm Bill

19   provide a private right of action, plaintiffs' NEPA and Farm Bill claims are brought under

20   the provision of the APA permitting suits challenging an agency action.[1]  Plaintiff's

21   complaint also contains two independent causes of action under the APA's notice and

22   comment provision.[2]

23   _____

24   [1] The APA provides that "a person suffering a legal wrong because of agency action, or
    adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof" and

25   that "[a]gency action made reviewable by statute and final agency action for which there is no
    other adequate remedy in a court are subject to judicial review."  5 U.S.C. §§ 702, 704.

26   [2] Section 553 of the APA provides generally that an agency must publish notice of a
    proposed rule-making in the Federal Register and afford "interested persons an opportunity to

**A.      Plaintiffs' Alleged Harm**

Plaintiffs' central allegation is that "the FSA has implemented a managed haying and grazing program that is seriously undermining the wildlife values of the CRP."  Complaint, docket no. 1, at ¶ 47.  Plaintiffs allege that, in so doing, the FSA has (1) "ignored its duty under the Farm Bill to ensure that managed haying and grazing only occurs when and where it is consistent with the conservation purposes of the CRP"; (2) "ignored its duty under NEPA to analyze and take into account these adverse impacts in its decision making process"; and (3) "failed to provide the public with the required opportunities to comment on this change in policy, both at the national level and at the individual state level."  Id.  Plaintiffs allege that the FSA's actions "will decrease many bird populations, [ ] seriously undermine the conservation value of the CRP, and harm the aesthetic, recreational and conservation interests of the Plaintiffs."  Id. at ¶ 48.  Plaintiffs also allege that they are "being deprived of their rights to have notice of agency action and to participate in and observe agency decisions."  Id.

**B.      Plaintiffs' Causes of Action**

In Count One, plaintiffs allege that the FSA violated NEPA by failing to "evaluate adequately the impacts of allowing managed haying and grazing once every three years nationwide."  Complaint, docket no. 1, at ¶ 54 (citing 42 U.S.C. § 4332(C)).  Specifically, plaintiffs allege that the Final PEIS prepared by the FSA was inadequate for the following reasons: (1) the FSA ignored the recommendations of conservation organizations that the FSA analyze the impacts of haying and grazing at the programmatic level; (2) the PEIS "failed to establish any specific alternatives for permitting managed haying or grazing on CRP lands"; and (3) the PEIS "failed to address alternatives for achieving the recommendation of the scientific panel that grazing be designed to achieve heterogeneity."

participate . . . through submission of written data, views, or arguments."  5 U.S.C. §§ 553(b)-(c).

1    Id. at ¶¶ 51, 53.

2

3         Count Two alleges that the FSA violated NEPA by failing to evaluate the impacts of

4    allowing state offices to shorten the primary nesting season in which haying or grazing is

5    permitted.  Id. at ¶¶ 57-59.  According to plaintiffs' allegations, the national FSA office

6    issued guidance allowing state offices to change primary nesting season ending dates,

7    ignoring "the PEIS's explicit assumption" that the FSA "would not make changes in this

8    critical parameter for protecting ground nesting birds."  Id. at ¶¶ 57-58.

9         Count Three alleges that the FSA violated NEPA by failing to consider an adequate

10   range of alternatives for implementing the CRP.  Id. at ¶¶ 62-63 (citing 42 U.S.C. §

11   4332(C)(ii)).[3]  In particular, plaintiffs allege that "[the] FSA failed to evaluate an alternative

12   course of action that stratified the country by different ecological type and sought to

13   maximize conservation benefits in different parts of the country by different managed haying

14   and grazing regimes."  Id. at ¶ 63.

15        Count Four alleges that, by approving inappropriate haying and grazing frequencies

16   and allowing state offices to shorten the primary nesting season, the FSA violated the Farm

17   Bill's requirement that the Secretary of Agriculture may only allow haying and grazing

18   consistent with the conservation purpose of the CRP.  Id. at ¶¶ 66-70.[4]  Plaintiffs further

19   allege that, by approving a one-in-three-year frequency for haying and grazing and allowing

20   state offices to shorten the primary nesting season, the FSA ignored independent data, the

21   information presented in the PEIS, and "the advice of federal and state wildlife agencies and

22

23        [3] See also 42 U.S.C. § 4332(C)(iii) (requiring a statement on "alternatives to the proposed

24   action").

25        [4] The Farm Bill provides that the Secretary of Agriculture may permit haying, grazing,
     or other commercial use of forage "consistent with the conservation of soil, water quality, and
     wildlife habitat (including habitat during nesting seasons for birds in the area)" and shall

26   "identify periods during which harvesting and grazing under this paragraph may be conducted."
     16 U.S.C. § 3832(a)(7).

wildlife conservation organizations without a rational basis."  Id. at ¶¶ 67-69.

Count Five alleges that the FSA violated the APA when it issued two CRP Notices without providing the public with notice and the opportunity to comment pursuant to 5 U.S.C. §§ 553(b) and 553(c).  Id. at ¶¶ 72-75.  Plaintiffs allege that "[t]he issuance of CRP Notices, such as CRP-[4]39 and CRP-440 delegated to state FSA committees the authority to establish primary nesting season dates."  Id. at ¶ 74.  Plaintiffs further allege that "[p]ursuant to these notices, FSA State committees in New York, Wisconsin, Wyoming, Idaho, and Washington changed primary nesting season dates" and that "[t]hese changes, either individually or collectively, constitute a substantive change in law or policy from the regulations released with the ROD and PEIS in May of 2003."  Id.

Count Six alleges that the FSA violated the APA by failing to require notice and comment on the conservation plans developed when individual farmers enroll in the CRP. Id. at ¶¶ 77-80.  Plaintiffs also allege that the FSA violated the APA by failing to require notice and comment on the standards by which conservation plans should be developed.  Id. at ¶¶ 78-80.  Specifically, plaintiffs allege that the FSA's reliance on conservation standards established in Field Office Technical Guides promulgated by NRCS, which were established without notice and comment, constitutes a violation of the APA.  Id.

Count Seven alleges that the FSA violated NEPA by failing to analyze the environmental impacts of the conservation plans developed when individual farmers enroll in the CRP.  Id. at ¶¶ 82-83.  Plaintiffs allege that "[i]ndividual conservation plans are federal actions that may significantly impact the human environment" and that "the FSA has violated 42 U.S.C. [§] 4332(C) by failing to prepare environmental assessments or other environmental documents to analyze impacts and to determine whether environmental impact statements should be prepared."  Id. at ¶ 83.

## C.    Plaintiffs' Requested Relief

Plaintiffs ask the Court to (1) issue a Declaratory Judgment that defendants violated NEPA, the Farm Bill and the APA, acted arbitrarily and capriciously, and must prepare various environmental documents; (2) "issue a preliminary and permanent injunction enjoining the defendants from implementing the managed haying and grazing portion of the 2002 Farm Bill pending compliance with NEPA and the provisions of the Farm Bill"; and (3) award plaintiffs their costs, expenses, and attorneys' fees.

## III.    THE MOTION TO DISMISS

Defendants argue that plaintiffs' complaint should be dismissed in its entirety for lack of subject matter jurisdiction.  See Motion, docket no. 10.  First, defendants argue that plaintiffs lack constitutional standing to maintain their claims.  Id. at 3, 13-18.  Second, defendants argue that plaintiffs' suit constitutes an "improper programmatic challenge" to the CRP, and thus cannot satisfy the jurisdictional prerequisites of the APA.  Id. at 4, 18-28.

In their Reply brief, defendants also argue that the Court should disregard certain improper and irrelevant material contained in plaintiffs' declarations.  Reply, docket no. 26, at 14.  The Court treats such allegations as a request to strike material pursuant to Local Rule 7(g).

# DISCUSSION

## I.    REQUEST TO STRIKE

Defendants argue that plaintiffs' declarations contain material that is improper and irrelevant.  Reply, docket no. 26, at 14.  First, defendants first argue that several of plaintiffs' declarations include the declarants' views on the merits of the claims.  See Reply, docket no. 26, at 14:12-17, n.11 (citing Miller v. Standard Fed. Sav. & Loan Assoc., 347 F. Supp. 185, 188 (D. Mich. 1972)).  Second, defendants argue that the declarants lack the requisite "personal knowledge" under Fed. R. Evid. 602 to testify on certain matters.  Id. at 15:4-9.  Third, defendants argue that the plaintiffs have failed to proffer the submitted declarations as expert testimony admissible under Fed. R. Evid. 702.  Id. at 15:9-10.

1     Defendants' Request to Strike, contained in their Reply brief, docket no. 26, is

2   GRANTED IN PART and DENIED IN PART.  Defendants' request is GRANTED as to the

3   following portions of the Braun declaration, docket no. 20: ¶¶ 6 and 7; the first two sentences

4   of ¶ 8; ¶¶ 9, 10, and 11; the first two sentences and the last sentence of ¶ 12; ¶¶ 13-18.

5   Defendants' request is GRANTED as to ¶ 7 of the Hesla declaration, docket no. 21.

6   Defendants' request is GRANTED as to the following portions of the Trego declaration,

7   docket no. 24: ¶¶ 12, 13, 14, 23, 24, and 25.  The remainder of defendants' request is

8   DENIED.

9   **II.      MOTION TO DISMISS**

10  **A.      Standard of Review**

11     On a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing

12  that subject matter jurisdiction is proper.  See Stock West, Inc. v. Confederated Tribes, 873

13  F.2d 1221, 1225 (9th Cir. 1989).  However, the nature of the plaintiff's burden depends on

14  whether the Rule 12(b)(1) motion raises a facial or a factual challenge to the court's subject

15  matter jurisdiction.  See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th

16  Cir. 2003).  A facial challenge asserts the inadequacy of the jurisdictional allegations in the

17  complaint, while a factual challenge seeks to introduce extrinsic evidence to prove a lack of

18  subject matter jurisdiction.  See Meliezer v. Resolution Trust Co., 952 F.2d 879, 881 (5th Cir

19  1992).  Where, as here, defendants raise a facial challenge, the Court will examine the

20  complaint as a whole to determine whether the plaintiff has alleged a proper basis of

21  jurisdiction.  See Cook v. Winfrey, 141 F.3d 322, 326 (7th Cir. 1998).  When assessing a

22  facial challenge to the court's subject matter jurisdiction, the court must accept the plaintiff's

23  allegations as true and construe them in the light most favorable to the plaintiff.  See Gould

24  v. Electronics Inc. v. United States, 220 F.3d 169, 176 (3rd Cir. 2000); 2 James W. Moore,

25  Moore's Federal Practice § 12.30 at 12-38, 12-39 (3rd ed. 1977).  Unlike a Rule 56 motion

26  for summary judgment, a Rule 12(b) motion to dismiss on the pleadings presumes that

1    "general allegations embrace those specific facts that are necessary to support the claim."

2    Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990).

3    **B.      Constitutional Standing**

4           The threshold question in every federal case is whether the plaintiff has demonstrated

5    a "case or controversy" within the meaning of Article III.  Warth v. Seldin, 422 U.S. 490,

6    498 (1975).  As an aspect of justiciability, the constitutional standing requirement ensures

7    that a plaintiff has alleged a personal stake in the outcome of the controversy sufficient to

8    "warrant his invocation of federal-court jurisdiction and to justify exercise of the court's

9    remedial powers on  his behalf."  Id. at 498-99.  To satisfy Article III's constitutional

10   standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a)

11   concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

12   the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

13   opposed to merely speculative, that the injury will be redressed by a favorable decision.

14   Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc., 528 U.S. 167, 180-81 (2000).

15   **1.      Injury in fact**

16          In determining whether a plaintiff has demonstrated an injury in fact, courts apply

17   different tests depending on whether the alleged injury is procedural or substantive.  Cantrell

18   v. City of Long Beach, 241 F.3d 674, 679 n.3  (9th Cir. 2001) ("The injury in fact

19   requirements are adjusted for plaintiffs raising procedural issues. . .").  Procedural injury

20   results from the violation of a statute that guarantees a particular *procedure*, while

21   substantive injury results from the violation of a statute that guarantees a particular *result*.

22   See West v. Sec'y of Dep't of Transp., 206 F.3d 920, 930 n.14 (9th Cir. 2000) (noting the

23   distinction between a procedural claim under NEPA and a substantive challenge to a forest

24   plan under the National Forest Management Act).  Plaintiffs alleging procedural injury must

25   show a "concrete interest" at stake but need not show that the substantive environmental

26   harm is imminent.  Cantrell, 241 F.3d at 679 n.3.  By contrast, plaintiffs alleging substantive

1  injury must meet "all the normal standards for redressability and immediacy" by showing

2  that

3

4  the injury is actual or imminent, and that it is likely that the injury will be redressed by a

5  favorable decision.  See Lujan v. Defenders of Wildlife, 504 U.S. at 555, 572 n.7 (1992).

6      In the instant case, plaintiffs allege procedural injury under NEPA and the APA in

7  Counts One, Two, Three, Five, Six, and Seven, and substantive injury under the Farm Bill in

8  Count Four.  NEPA and the APA, unlike the substantive provisions of the Farm Bill, simply

9  guarantee a particular procedure, not a particular result.  Compare, 42 U.S.C. § 4332

10 (requiring that agencies follow procedures for preparing environmental impact statements

11 where major agency action would significantly affect the environment) and 5 U.S.C. §§

12 553(b)-(c) (requiring that agencies follow notice and comment procedures for proposed

13 rulemaking) with 16 U.S.C. § 3832(a)(7) (providing that the Secretary of Agriculture may

14 permit haying, grazing, or other commercial use of forage "consistent with the conservation

15 of soil, water quality, and wildlife habitat").  Accordingly, the Court will separate its analysis

16 of plaintiffs' claims into allegations of procedural injury and substantive injury.

17      **a.      Procedural injury in fact**

18      To show a procedural injury in fact, plaintiffs must allege that (i) the defendant

19 violated certain procedural rules; (ii) these rules protect plaintiffs' concrete interests; and (iii)

20 it is reasonably probable that the challenged action will threaten their concrete interests.

21 Citizens for Better Forestry v. USDA, 341 F.3d 961, 969-970 (9th Cir. 2003).  The Court

22 considers each requirement in turn.

23      **i.      Violation of procedural rules**

24      Allegations of procedural injury must be tied to a substantive "harm to the

25 environment" consisting of "added risk to the environment that takes place when

26 governmental decisionmakers make up their minds without having before them an analysis

ORDER   -10-

(with public comment) of the likely effects of their decision on the environment." Citizens,

341 F.3d at 970-971 (citations omitted).  Plaintiffs allege such procedural violations of both

NEPA and the APA.[5]

**NEPA Counts**.  The Court finds that plaintiffs' NEPA counts allege cognizable

procedural violations.  In Counts One, Two, Three, and Seven, plaintiffs allege that

defendants violated the provisions of NEPA requiring government agencies to evaluate the

environmental impacts of, and alternatives to, any proposed action.  See 42 U.S.C. §

4332(C).  Counts One, Two, and Three challenge the adequacy of the PEIS that analyzed the

implementation of the Farm Bill's amendments to the CRP.  The Ninth Circuit has

recognized a procedural injury in cases involving allegations that an EIS is inadequate.  See,

e.g., Cantrell, 241 F.3d at 679.  Count Seven challenges the FSA's failure to analyze the

impacts of the conservation plans developed when individual farmers enroll in the CRP.  The

Ninth Circuit has also recognized a procedural injury in cases involving allegations that a

defendant failed to prepare an EIS.  See, e.g., Davis v. Coleman, 521 F.2d 661, 671 (9th Cir.

1975).

**APA Counts**.  The Court finds that plaintiffs' APA counts allege cognizable

procedural violations.  In Counts Five and Six, plaintiffs allege that defendants violated the

provisions of the APA requiring notice and comment.  See 5 U.S.C. §§ 553(b)-(c).  The

Ninth Circuit has recognized a procedural injury where the plaintiff alleged that defendant

violated the notice and comment requirements embodied in the APA and HUD regulations.

Yesler Terrace Community Council v. Cisneros, 37 F.3d 442, 445-46 (9th Cir. 1994)

(finding a procedural injury in plaintiffs' allegations that "it was injured when HUD, without

---

[5] Although Citizens involved procedural violations of NEPA and the Endangered Species Act, "the analysis is equally applicable to claims of any procedural environmental injury." Citizens, 341 F.3d at 971.

1  following notice and comment rulemaking procedures, determined that Washington PHAs

2  can dispense with grievance hearings in crime-related evictions"); see also Kootenai Tribe of

3  Idaho v. Veneman, 313 F.3d 1094, 1115 (9th Cir. 2002) (finding a procedural violation in

4  plaintiffs' allegations that defendant violated the notice and comment requirements of

5  NEPA).

6              **ii.    Concrete interests**

7        Defendants argue that plaintiffs' allegations of procedural injury fail to demonstrate

8  "the concrete, non-speculative injury and geographic nexus required to establish standing."

9  Reply, docket no. 26, at 2.  However, defendants' arguments misapprehend the degree of

10  specificity required at this stage of litigation.  Defendants cite Citizens for Better Forestry v.

11  USDA, 341 F. 3d 961, 971 (9th Cir. 2003) for the proposition that "environmental plaintiffs

12  must allege that they will suffer harm by virtue of their geographic proximity to and use of

13  areas" affected by the government action.  See Reply, docket no. 26, at 6.  Defendants

14  describe this requirement as the "geographic nexus" test and argue that plaintiffs have not

15  met this test because they fail to identify specific acreage used by plaintiffs and harmed by

16  government action.  Id.  Like the Court in Lujan v. Nat'l Wildlife Fed'n, the Court in Citizens

17  was reviewing the lower court's ruling on a Rule 56 motion for summary judgment and

18  required a greater degree of specificity than a court would require when ruling on a motion to

19  dismiss.  See id. at 961; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 889.  Even so, the Court

20  held the plaintiffs to a relatively lenient standard: "[E]nvironmental plaintiffs must allege that

21  they will suffer harm by virtue of their geographic proximity to and use of areas that will be

22  affected by [defendant's] policies."  Citizens, 341 F.3d at 971.  Consequently, the Court

23  found that "Citizens need not assert that any specific injury will occur in any specific

24  national forest that their members visit."  Id.

25        The Court finds that plaintiffs have alleged facts sufficient to demonstrate a concrete

26  interest in CRP lands.  In the Complaint, each plaintiff has alleged a geographic nexus to

ORDER   -12-

1    CRP lands by describing their members' use of such lands.  For example, the Complaint

2    alleges that members of plaintiff National Wildlife Federation (NWF) "regularly use CRP

3    lands nationwide for hunting, fishing, bird watching, and other recreation."  Complaint,

4    docket no. 1, at ¶ 4.  Plaintiff NWF has thus established a geographic nexus by virtue of its

5    members' particularized interest in and use of CRP lands nationwide.  The Complaint also

6    alleges that members of plaintiff Indiana Wildlife Federation (IWF) "use lands enrolled in

7    CRP for hunting, hiking, and other recreational aesthetic activities."  Id. at ¶ 6.  Similarly, the

8    Complaint alleges that "[t]he South Dakota Wildlife Federation [SDWF] has a significant

9    interest in the management of lands enrolled in the CRP throughout the state of South Dakota

10   and across the country."  Id. at ¶ 7.  Plaintiffs IWF and SDWF have thus established a

11   geographic nexus by virtue of their members' particularized interest in and use of CRP lands.

12   Defendants' argument that the Court should dismiss plaintiffs whose members have not filed

13   supporting declarations is without merit, for the facts alleged in the Complaint are sufficient

14   to withstand a motion to dismiss.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 889.

**iii.     Reasonably probable**

15

16       Environmental plaintiffs seeking to enforce a procedural requirement "need only

17   establish 'the reasonable probability of the challenged action's threat to [their] concrete

18   interest.'"  Citizens, 341 F.3d at 971 (quoting Hall v. Norton, 266 F.3d 969, 977 (9th Cir.

19   2001)).  Defendants argue that many of plaintiffs' allegations "rely on speculation, that the

20   government will authorize grazing at a particular frequency on a particular acreage, to

21   establish harm to a particular use."  Reply, docket no. 26, at 6.  Because procedural injuries

22   are deemed immediate, the Ninth Circuit has consistently rejected similar arguments.  See

23   Citizens, 341 F.3d at 973 (citing Resources Ltd. v. Robertson, 35 F.3d 1300 (9th Cir. 1994);

24   Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir. 1994); Idaho

25   Conservation League v. Mumma, 956 F.2d 1508 (9th Cir. 1992)).  The Citizens Court

26   reaffirmed the principle that "environmental plaintiffs have standing to challenge not only

site-specific plans, but also higher-level, programmatic rules that impose or remove

requirements on site-specific plans." <u>Citizens</u>, 341 F.3d at 975.  Here, as in <u>Citizens</u>,

plaintiffs have asserted that "site-specific plans will follow the requirements of national rules

(as they must), such that decreased substantive national rules will likely result in less

environmental protection at the regional and site-specific levels." <u>Id</u>. at 974-75.  Thus,

plaintiffs have demonstrated that they have suffered a procedural injury in fact.

### b.    Substantive injury in fact

In Count Four, plaintiffs allege substantive injury from defendants' violation of the

Farm Bill's provision that the Secretary of Agriculture may only allow haying and grazing

consistent with the conservation purpose of the CRP.  <u>See</u> Complaint, docket no. 1, at ¶¶ 65-

70.  Plaintiffs assert that defendants' violation of the Farm Bill is "arbitrary, capricious, an

abuse of discretion [and] in violation of the law." <u>Id</u>. at ¶ 70.  The touchstone of plaintiffs'

standing lies in their assertion of injury as a result of defendants' actions:

> [T]he FSA has implemented a managed haying and grazing
> program that *is seriously undermining* the wildlife values of the
> CRP . . . The Plaintiffs *are being damaged* by FSA's actions. By
> allowing managed haying and grazing during the primary nesting
> seasons and at frequencies that will undermine the habitat value
> of lands in the conservation reserve program, FSA's actions will
> decrease many bird populations, and seriously undermine the
> conservation value of the CRP, and harm the aesthetic,
> recreational and conservation interests of the Plaintiffs.

Complaint, docket no. 1, at ¶¶ 47, 48 (emphasis added).  Plaintiffs have thus alleged actual,

significant harm to the conservation value of CRP lands, and such allegations are

particularized by their members' use of CRP lands and interest in the conservation value of

CRP lands.  Such allegations are sufficient to confer standing at this stage.  The Supreme

Court has held that "environmental plaintiffs adequately allege injury in fact when they aver

that they use the affected area and are persons 'for whom the aesthetic and recreational

values of the area will be lessened' by the challenged activity." <u>Friends of the Earth, Inc. v.</u>

<u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 183 (2000) (quoting <u>Sierra Club v. Morton</u>,

ORDER   -14-

1  405 U.S. 727, 735, (1972)).  Plaintiffs have done just that.

2      Defendants argue that plaintiffs have failed to allege a cognizable injury in fact for

3  three reasons.  Motion, docket no. 10, at 15.  First, defendants argue that plaintiffs have

4  failed to identify "any specific acreage where their members' interests have been harmed."

5  Id.  Second, defendants argue that plaintiffs have not alleged that the land they claim to use

6  "has been affected (or is in imminent danger of being affected) by the haying and grazing

7  program and its regulations."  Id.  Third, defendants argue that plaintiffs have not alleged a

8  "cognizable interest of theirs in lands owned by private farmers who have chosen to enroll in

9  the CRP program."  Id.  On all three issues, defendants' arguments are misplaced.

10      Defendants' suggestion that plaintiffs must identify specific acreage is inappropriate

11  on a motion to dismiss.  Defendants rely on Lujan v. Nat'l Wildlife Fed'n to support their

12  argument that plaintiffs lack standing because they have failed to specify a particular location

13  where their members have been injured.  Such reliance on Lujan v. Nat'l Wildlife Fed'n is

14  misplaced.  There, the Court expressly distinguished a Rule 56 summary judgment motion

15  from a Rule 12(b) motion to dismiss, stating that "[t]he latter, unlike the former, presumes

16  that general allegations embrace those specific facts that are necessary to support the claim."

17  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 889 (citing Conley v. Gibson, 355 U.S. 41, 45-46

18  (1957)).  Indeed, the Court identified this critical distinction in an omitted portion of the

19  sentence relied upon and quoted in defendants' opening brief: "*Rule 56(e) is assuredly not

20  satisfied by* averments which state only that one of respondent's members uses unspecified

21  portions of an immense tract of territory."  See Motion, docket no. 10, at 15 (quoting Lujan

22  v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889) (emphasis added).  Defendants' motion is not

23  brought pursuant to Rule 56, but rather is brought pursuant to Rule 12(b)(1).  See Motion,

24  docket no. 10,  at 1.  This posture "affects the degree of specificity of facts which the

25  [plaintiff] must show to establish a sufficient likelihood of personal injury to its members."

26  See National Wildlife Federation v. Burford, 835 F.2d 305, 312 (D.C. Cir. 1987) (citing

1   United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S.

2   669, 689 n.15 (1973)) (describing the SCRAP Court's acknowledgment that "on a motion for

3   summary judgment, plaintiff might have to show injury with greater specificity, for example,

4   by naming a specific forest that was used and would be affected by the challenged agency

5   action"). Because a Rule 12(b) motion presumes that general allegations embrace those

6   specific facts that are necessary to support the claim, plaintiffs' allegations of injury arising

7   from harm to CRP lands are sufficient to satisfy the injury-in-fact requirement.[6] See Lujan v.

8   Nat'l Wildlife Fed'n, 497 U.S. at 889.

9       Defendants also argue that plaintiffs "fail to allege that the lands that they do claim to

10  use are lands [that] have been or are in imminent danger of being harmed by the managed

11  haying and grazing program." Reply, docket no. 26, at 7 (emphasis in original). Defendants'

12  argument is not supported by the record, as the Complaint alleges that, in the nine states that

13  have shortened the primary nesting season, "managed haying and grazing was allowed in

14  2003 when many bird species were either on the nest or were just beginning to raise their

15  young." Complaint, docket no. 1, at ¶ 43. Plaintiffs also allege that "[t]hroughout the West,

16  haying and grazing on a one in three year frequency is severely impacting the density of

17  grassland stands found on CRP lands and reducing the habitat value of the CRP to wildlife,

18  especially ground nesting birds." Id. at ¶ 45. Such allegations satisfy the requirement that

19  the alleged injury must be actual or imminent.

20      Finally, defendants argue that plaintiffs cannot demonstrate an injury in fact because

21  _____

22      [6] In their Response, plaintiffs advance an additional argument that appears to have merit
    but finds meager support in environmental case law, which almost uniformly assumes that
23  plaintiffs must allege injury by virtue of harm to *land*. Specifically, plaintiffs argue that they
    have alleged injury by virtue of harm to "*wildlife*, specifically birds, including migratory birds"
24  and that because birds naturally move around, "impacts to bird nesting and brood rearing on
    CRP lands will also affect other lands, public and private, which birds might use." Response,
25  docket no. 18, at 13. The Ninth Circuit has stated that "[t]o allege a legally protected, concrete
    aesthetic interest, a plaintiff must show merely that the challenged action affects his aesthetic
26  or ecological surroundings." Cantrell v. City of Long Beach, 241 F.3d 674, 681 (9th Cir. 2001).
    The Court finds that in the instant case, plaintiffs' aesthetic interest in birdwatching, in addition
    to plaintiffs' aesthetic interest in CRP lands, constitutes a legally protected interest.

they fail to allege "that they have a legally protected interest in . . . private lands, which are the property of the farmers and other participants in the CRP."  Motion, docket no. 10, at 17-18.  The Ninth Circuit has squarely rejected this argument:

> [W]e have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest . . . That the litigant's interest must be greater than that of the public at large does not imply that the interest must be a substantive right sounding in property or contract.

Cantrell, 241 F.3d at 681.[7]

**2.    Causation and Redressability**

In addition to meeting the injury-in-fact requirement, plaintiffs easily meet the two remaining standing elements, which defendants do not challenge.  Actions and decisions compromising the CRP are directly traceable to the FSA, and this Court has the authority to redress the injuries being suffered by plaintiffs.

The Court concludes that plaintiffs have standing to bring this suit.

**C.    Ripeness (The "Programmatic Challenge" Bar)**

**1.    Legal Framework**

Defendants contend that plaintiffs' suit constitutes an improper programmatic challenge to the CRP and thus falls outside the court's jurisdiction under the APA.  The Supreme Court first articulated the programmatic challenge bar in Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990), to preclude plaintiffs from challenging broad agency policies and programs:

> [R]espondent cannot seek wholesale improvement of this

---

[7] Defendants argue, to no avail, that Cantrell is distinguishable because the plaintiffs in that case claimed "injury to their ability to view wildlife from publicly accessible land adjacent to the property allegedly being harmed."  Motion, docket no. 10, at 18.  The Complaint in the instant case includes similar allegations.  For example, in addition to alleging that members of plaintiff Indiana Wildlife Federation "use lands enrolled in the CRP," the Complaint alleges that IWF members "also derive benefits from well managed CRP lands through enhanced wildlife viewing opportunities, better hunting and improved water quality and soil conservation."  Complaint, docket no. 1, at ¶ 6.

1
2
3
4
5
6

> program by court decree, rather than in the offices of the
> Department or the halls of Congress, where programmatic
> improvements are normally made. Under the terms of the APA,
> respondent must direct its attack against some particular "agency
> action" that causes it harm.
>    . . . [A] regulation is not ordinarily considered the type of
> agency action "ripe" for judicial review under the APA until the
> scope of the controversy has been reduced to more manageable
> proportions, and its factual components fleshed out, by some
> concrete action applying the regulation to the claimant's situation
> in a fashion that harms or threatens to harm him.

7   Id. at 891 (citing, inter alia, Abbott Laboratories v. Gardner, 387 U.S. 136 (1967)) (emphasis

8   added).  Thus, the Court announced the programmatic challenge bar as a variant on the

9   ripeness doctrine to be applied in APA cases where the plaintiff has failed to identify a

10  specific "final agency action" that has "an actual or immediately threatened effect." Lujan v.

11  NWF, 497 U.S. at 894.

12         In Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 728 (1998), where plaintiffs

13  challenged a land and resource management plan adopted by the Forest Service, the Court

14  cited to the decision in Lujan v. Nat'l Wildlife Fed'n but applied a traditional ripeness test

15  and held that "the controversy is not yet ripe for judicial review."[8]  While the Court in Lujan

16  v. Nat'l Wildlife Fed'n barred programmatic challenges by imposing a requirement of final

17  agency action with actual or imminent effect, the Court in Ohio Forestry framed the ripeness

18  inquiry as a three-part test, which considers "(1) whether delayed review would cause

19  hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere

20  with further administrative action; and (3) whether the courts would benefit from further

21  factual development of the issues presented." Ohio Forestry, 523 U.S. 726, 733.  By

22  contrast, in Norton v. S. Utah Wilderness Alliance, 124 S. Ct. 2373, 2379 (2004), where

23  plaintiffs sued the Bureau of Land Management for its purported failure to act as required by

24

---

25
26
[8] The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties." Abbott, 387 U.S. 148 at 148-49.

1   the APA, the Court never mentioned the word "ripe" but reiterated that "[t]he limitation to

2   discrete agency action precludes the kind of broad programmatic attack we rejected in Lujan

3   v. Nat'l Wildlife Fed'n."

4        The Ninth Circuit recognizes the programmatic challenge bar as a variant on the

5   ripeness doctrine.  See Laub v. United States DOI, 342 F.3d 1080, 1088 (9th Cir. 2003)

6   (describing the test applied in Lujan v. NWF as "the ripeness requirement embodied in the

7   first prong of the APA test for prudential standing--that the challenged action be a final

8   agency action"); see also High Sierra Hikers Ass'n v. Blackwell, 381 F.3d 886 (9th Cir.

9   2004) (applying the programmatic challenge bar articulated in Lujan v. NWF and labeling

10  the discussion "Ripeness").  Thus, the Court construes defendants' contention that plaintiffs'

11  suit constitutes an "improper programmatic challenge" as a ripeness challenge.  In analyzing

12  defendants' arguments, the Court will apply the standards announced by the Supreme Court

13  in Lujan v. NWF, and applicable Ninth Circuit cases.

14  **2.    Analysis**

15       In Lujan v. NWF, plaintiffs alleged that the Bureau of Land Management ("BLM")

16  violated several federal laws and regulations in the administration of its "land withdrawal

17  review program."  497 U.S. at 875, 877-79.  The alleged violations included "failure to revise

18  land use plans in proper fashion, failure to submit certain recommendations to Congress,

19  failure to consider multiple use, inordinate focus upon mineral exploitation, failure to

20  provide required public notice, [and] failure to provide adequate environmental impact

21  statements."  Id. at 891 (citations omitted).  Importantly for the Court's analysis, plaintiffs'

22  claims arose "not pursuant to specific authorization in the substantive statute, but only under

23  the general review provisions of the APA."  Id. at 882 (citing 5 U.S.C. § 704).  Noting that

24  APA review is available only with respect to final agency actions, the Court held that

25  plaintiffs could not challenge BLM's land withdrawal review program because the program

26  was "not an identifiable action or event."  Id. at 894-99.

1     In <u>Laub v. United States DOI</u>, plaintiffs alleged that defendants failed to follow

2   procedures mandated by NEPA and the California Environmental Quality Act when

3   promulgating a programmatic environmental impact statement/environmental impact report

4   (EIS/EIR) and certifying the EIS/EIR in a Record of Decision.  342 F.3d at 1083.

5   Specifically, plaintiffs alleged that defendants had "failed to consider any reasonable

6   alternatives to the proposed conversion of agricultural resources to environmental uses, that

7   they failed to consider the direct, indirect and cumulative impacts of projects that will cause

8   significant effects on agricultural resources, and that their analysis of mitigation options is

9   inadequate."  <u>Id</u>. at 1084.  The district court granted the defendants' Rule 12(b)(1) motion to

10  dismiss for lack of subject matter jurisdiction, holding that the issuance of EIS/EIR was not a

11  final agency action ripe for review.  <u>Id</u>.  The plaintiffs appealed, arguing that "the question of

12  whether an agency has complied with NEPA's procedural requirements in formulating a

13  programmatic EIS is immediately ripe for review before any site-specific action is taken."

14  <u>Id</u>. at 1088.  The Ninth Circuit agreed, stating that "[s]ince <u>Ohio Forestry</u> was decided, we

15  have recognized the distinction between substantive challenges which are not ripe until

16  site-specific plans are formulated, and procedural challenges which are ripe for review when

17  a programmatic EIS allegedly violates NEPA."  <u>Id</u>. at 1090; <u>see also</u> <u>Citizens</u>, 341 F.3d at

18  977 ("[A] person with standing who is injured by a failure to comply with the NEPA

19  procedure may complain of that failure at the time the failure takes place, for the claim can

20  never get riper.") (citing <u>Ohio Forestry</u>, 523 U.S. at 737).

21     Accordingly, the Court again will separate its analysis of plaintiffs' claims into

22  allegations of procedural injury (Counts One, Two, Three, Five, Six, and Seven) and

23  substantive injury (Count Four).

24     **a.     Procedural injury**

25     **NEPA Counts.**  Plaintiffs allege procedural violations of NEPA in Counts One, Two,

26  Three, and Seven.  Plaintiff's three challenges to the Final PEIS (Counts One, Two, and

1   Three) under NEPA are ripe for review.  The Supreme Court and the Ninth Circuit have

2   stated without qualification that procedural challenges under NEPA are ripe at the time of the

3   alleged violation, even before site-specific action is taken.  See Ohio Forestry, 523 U.S. at

4   737; Laub v. United States DOI, 342 F.3d at 1090; Citizens, 341 F.3d at 977.  Defendants'

5   broad assertion that "plaintiffs fail to identify the specific authorizations they are purportedly

6   challenging" is not supported by the record.  Counts One, Two, and Three directly challenge

7   the promulgation of the PEIS.  See, e.g., Complaint, docket no. 1, at ¶ 52 ("The Final PEIS

8   that the FSA prepared in 2003 on the CRP did not evaluate . . . the environmental

9   consequences associated with haying and grazing frequencies"); ¶ 57 ("The Final PEIS

10  prepared by the FSA on the CRP did not evaluate the impact of changing the nesting season

11  dates"); ¶ 63 ("The limited range of alternatives evaluated by FSA in the PEIS violates

12  NEPA's requirements that a reasonable range of alternatives be considered").

13          However, defendants' argument that "plaintiffs' four NEPA counts as set forth in their

14  Complaint do not challenge the ROD and underlying analysis in the PEIS" is accurate in two

15  respects, only one of which affects the Court's analysis.  See Reply, docket no. 26, at 13.

16  First, it is true that the Complaint does not explicitly challenge the ROD, but this fact is not

17  fatal to plaintiffs' claims, because plaintiffs do challenge the PEIS in Counts One, Two, and

18  Three, and "procedural challenges . . . are ripe for review when a programmatic EIS

19  allegedly violates NEPA."  See Laub v. United States DOI, 342 F.3d at 1090.  Second, and

20  more importantly, it is true that in Count Seven plaintiffs challenge neither the ROD or the

21  underlying analysis in the PEIS.  Instead, plaintiffs allege that

22              [i]ndividual conservation plans are federal actions that may
            significantly impact the human environment. The FSA has
23          violated 42 U.S.C. 4332(C) by failing to prepare environmental
            assessments or other documents to analyze the impacts and to
24          determine whether environmental impact statements should be
            prepared.
25

26  Complaint, docket no. 1, at ¶ 83.  This fact is significant, for "individual conservation plans"

    do not amount to an "identifiable action or event."  See Lujan v. NWF, 497 U.S. at 894-99.

ORDER   -21-

1    Had plaintiffs identified a particular conservation plan in their Complaint, and alleged that

2    the conservation plan was a federal action taken in violation of NEPA, plaintiffs' claim

3    would be ripe for review if the plan constituted "final agency action."  See Lujan v. NWF,

4    497 U.S. at 894.  However, the Court need not decide whether conservation plans constitute

5    final agency action, because plaintiffs have failed to identify any *specific* agency action, but

6    instead refer to a generic, programmatic bundle of actions.  See id. at 891 ("Under the terms

7    of the APA, respondent must direct its attack against some particular 'agency action' that

8    causes it harm").  Thus, Count Seven is not ripe for review because it violates the

9    programmatic challenge bar and must be dismissed.  See id.

10        **APA Counts**.  In Counts Five and Six, Plaintiffs allege procedural violations of the

11    APA's notice and comment requirement.  See 5 U.S.C. §§ 553(b)-(c).  Specifically, plaintiffs

12    allege that the FSA violated the APA when it failed to provide for notice and comment on

13    two CRP Notices (Count Five) and "individual conservation plans" (Count Six).  Complaint,

14    docket no. 1, at ¶¶ 71-80.  Because Count Six fails to challenge a specific agency action, it is

15    not ripe for review, for the reasons discussed above.  See id. at ¶¶ 76-80.  Count Five,

16    however, does allege that two specific actions violated the APA: the issuance of CRP 439

17    and the issuance of CRP 440.  The question, then, is whether the FSA's issuance of these

18    CRP Notices is the "type of agency action 'ripe' for judicial review under the APA."  See

19    Lujan v. NWF, 497 U.S. at 891.

20        In Anchorage v. United States, 980 F.2d 1320, 1323 (9th Cir. 1992), when

21    considering the ripeness of plaintiffs' claim that "the EPA and the Corps violated the notice

22    and comment requirement of the APA," the Court stated that agency action is generally fit

23    for review "if the issues presented are purely legal and the regulation at issue is a final

24    agency action."  The Court qualified this general statement by adding that "there are

25    instances in which a purely legal challenge to final agency action will not be considered

26    ripe."  Id. (citing Lujan v. NWF, 497 U.S. 781 ("[A]gency regulations are not ordinarily ripe

1  for review until the 'factual components [have been] fleshed out, by some concrete action

2  applying the regulation.'")).  Thus, the Ninth Circuit's test for determining the ripeness of an

3  alleged violation of the APA's notice and comment requirement asks (1) whether the issues

4  are purely legal; (2) whether the regulation at issue is a final agency action; and (3) whether

5  the regulation has been applied by concrete action.  In the present case, the parties do not

6  dispute that the challenge to the CRP Notices presents purely legal issues.  Instead, the

7  parties focus on the requirements of final agency action and concrete application of the

8  regulation.

9       The Supreme Court has stated that, "[a]s a general matter, two conditions must be

10  satisfied for agency action to be 'final.'"  Bennett v. Spear, 520 U.S. 154, 178 (1997).

11           First, the action must mark the "consummation" of the agency's
            decisionmaking process . . . --it must not be of a merely tentative
12           or interlocutory nature. And second, the action must be one by
            which "rights or obligations have been determined," or from
13           which "legal consequences will flow[.]"

14  Id. (citations omitted).  Interpreting this language, the Seventh Circuit has stated that an

15  action is final when "its impact is sufficiently direct and immediate and has a direct effect . .

16  . on day-to-day business."  Home Builders Ass'n v. United States Army Corps of Eng'rs, 335

17  F.3d 607, 619 (7th Cir. 2003).  Moreover, "[f]inality is to be interpreted 'in a pragmatic

18  way,' meaning that even pre-enforcement regulations that merely state an agency's intentions

19  may be final for review."  Oregon v. Ashcroft, 368 F.3d 1118, 1147 (9th Cir. 2004) (citing

20  Abbott Laboratories v. Gardner, 387 U.S. 136, 149-50 (1967)).

21       Defendants argue that the CRP Notices are not "final agency action" because they

22  "merely delegate authority to change nesting season dates to individual FSA State

23  Committees."  Reply, docket no. 26, at 11.  Defendants contend that plaintiffs fail to meet

24  the Bennett finality standard because (1) "[n]otices are internal rules that outline the process

25  for FSA decisionmaking, they are not the 'consummation' of the agency's decision-making

26  process"; and (2) "[n]or does the decision to delegate determine the 'rights or obligations' of

ORDER   -23-

1    anyone . . . as no legal consequences flow from the mere delegation of authority."  Reply,

2    docket no. 26, at 11.  Defendants's arguments are not supported by the record.  For example,

3    CRP-440[9] states that it "provides policy: about adjusting the primary nesting and

4    broodrearing season [,] for determining the haying and grazing period [, and] for assessing

5    payment reductions."  Notice CRP-440, attached as Ex. C to Response, docket no. 18.

6    Although CRP-440 does delegate authority, as defendants suggest, to State Technical

7    Committees (STCs) "to adjust the beginning and ending dates for the primary nesting and

8    broodrearing season," this delegation itself meets the Bennett test because prior to the

9    issuance of CRP-440, STCs had no such authority to adjust the nesting season dates.  See id.

10   Moreover, contrary to defendants' arguments, CRP-440 contains mandatory language from

11   which rights and obligations flow.  For example, it provides that (1) "STC's . . . shall review

12   the primary nesting and broodrearing season"; (2) "STC's shall . . . determine appropriate

13   haying and grazing periods [,] establish a grazing period not to exceed 120 consecutive days

14   outside of the primary nesting and broodrearing season [, and] establish a haying period not

15   to exceed 90 consecutive days outside of the primary nesting and broodrearing season."; (3)

16   "[p]articipants shall not be assessed an additional payment reduction for haying and grazing

17   for that same acreage after October 1."  Id. (emphasis added).  The Court concludes that the

18   issuance of the two CRP Notices constituted final agency action.

19         Defendants also argue that plaintiffs' APA claim is not fit for review because

20   "plaintiffs have failed to allege any specific harm to their concrete interests."  Motion, docket

21   no. 10, at 24-25.  Defendant's argument is without merit.  The Complaint alleges that,

22   "[p]ursuant to these [CRP] notices, FSA State committees in New York, Wisconsin,

23   Wyoming, Idaho, and Washington changed primary nesting season dates" and that "[t]hese

24   changes, either individually or collectively, constitute a substantive change in law or policy

25   _____

26       [9] The Court focuses it inquiry on CRP-440 because it "obsoletes Notice CRP-439" and
     is substantially similar to CRP-439.  Compare Notice CRP-440, attached as Ex. C to Response,
     docket no. 18, with Notice CRP-439, attached as Ex. B to Response, docket no. 18.

from the regulations released with the ROD and PEIS in May of 2003." Complaint, docket

no. 1, at ¶ 74. Plaintiffs' allegation is supported by the record. <u>Compare</u> Ending Dates for

the Primary Nesting Season (showing ending dates prior to issuance of CRP Notices),

attached as Ex. A to Response, docket no 18 <u>with</u> Nesting Season and Haying and Grazing

Dates (showing ending dates after issuance of CRP Notices), available at

http://www.fsa.usda.gov/dafp/cepd/crp/nesting.htm. The Court finds a "concrete action

applying the regulation" in plaintiffs' allegation that, pursuant to the CRP Notices, FSA State

committees changed primary nesting season dates. <u>See</u> <u>Lujan v. NWF</u>, 497 U.S. 781. Thus,

Count Five is ripe for review.

> **b.    Substantive injury**

Count Four alleges substantive injury from defendants' violation of the Farm Bill.

<u>See</u> Complaint, docket no. 1, at ¶¶ 65-70. Specifically, plaintiffs allege that FSA violated the

Farm Bill's substantive requirement that haying and grazing practices must be consistent

with the conservation purpose of the CRP when it (1) approved managed haying and grazing

on a one-in-three-year frequency; and (2) allowed FSA state offices to shorten the primary

nesting season. <u>Id</u>. Defendants argue that "neither of these decisions is a justiciable final

agency action that threatens actual or immediate harm to plaintiffs within the meaning of the

APA." Motion, docket no. 10, at 22. It is true that plaintiffs fail to allege a concrete action

with regard to the first decision, regarding haying and grazing frequency. However, as

previously discussed, plaintiffs have alleged concrete action regarding the decision to allow

FSA state offices to shorten the primary nesting season. Count Four alleges that "the FSA

has allowed state FSA offices to change primary nesting season dates and to allow managed

haying and grazing *during periods of the year that will ensure the destruction of nests,*

*nesting birds, and newly hatched broods*."[10]  Complaint, docket no. 1, at ¶ 68 (emphasis

----

[10] Defendants' reference to <u>Washington Envtl. Council v. Nat'l Marine Fisheries Serv.</u>, 2002 WL 511497 (W.D. Wash. Feb. 27, 2002) is unavailing. In that case, the Court stated that "[p]laintiffs are making a non-site-specific challenge in Counts II and III to the substance of an

added).  Because plaintiffs have alleged a concrete action applying the CRP Notices to their

situation "in a fashion that harms or threatens to harm" them, plaintiffs' Farm Bill claim is

ripe for review.  See Lujan v. NWF, 497 U.S. at 891.

**D.     Conclusion**

For the reasons stated in this Order, defendants' Motion to Dismiss for lack of subject

matter jurisdiction, docket no. 10, is GRANTED IN PART and DENIED IN PART as

follows.  The motion is GRANTED as it relates to Counts Six and Seven of the Complaint.

Accordingly, Counts Six and Seven are hereby dismissed.  The motion is DENIED as it

relates to Counts One, Two, Three, Four, and Five of the Complaint.

IT IS SO ORDERED.

DATED this 19th day of May, 2005.

Thomas S. Zilly
United States District Judge

_____

agency plan, and are therefore subject to the rigorous inquiry laid out in Ohio Forestry."  Id. at
*4.  Here, plaintiffs are making a site-specific challenge in Count Four, and thus it is ripe for
review even under the broadest possible reading of Ohio Forestry.  In addition, the Court in Ohio
Forestry was reviewing the Sixth Circuit's reversal of the District Court's grant of summary
judgment under Rule 56.  Ohio Forestry, 523 U.S. at 732.  As previously discussed, a Rule 12(b)
motion to dismiss on the pleadings presumes that "general allegations embrace those specific
facts that are necessary to support the claim."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889
(1990).  Thus, the Court presumes that plaintiffs' general allegations regarding primary nesting
season dates embrace the site-specific facts that are necessary to support the claim.